WETHERINGTON v. N.C. DEP'T OF CRIME CONTROL & PUB. SAFETY

[231 N.C. App. 503 (2013)]

*Fickley,* and *Moody* provide no basis for affirming the trial court's order in this case.

*Bockweg* is the controlling authority. Because this case involves a separate wrong from the wrong asserted in the federal action, the trial court erred in concluding that the doctrines of claim-splitting and res judicata applied. Consequently, we reverse the order granting defendants' judgment on the pleadings.

Reversed and remanded.

Judges McGEE and ROBERT C. HUNTER concur.

━━━━━━━━

THOMAS C. WETHERINGTON, Petitioner

v.

N.C. DEPARTMENT OF CRIME CONTROL & PUBLIC SAFETY; NORTH CAROLINA HIGHWAY PATROL, Respondent

No. COA13-405

Filed 17 December 2013

1. **Police Officers—highway trooper's dismissal—no just cause—alleged violation of Truthfulness policy**

    The superior court did not err in concluding that petitioner highway trooper's conduct did not constitute just cause for dismissal based on an alleged violation of respondent's Truthfulness policy. The findings did not support respondent's characterization of petitioner's statements as an elaborate lie full of fabricated details.

2. **Appeal and Error—cross-appeal—no need to address alternative basis**

    Although petitioner filed a cross-appeal as an alternative basis to conclude that there was no just cause for petitioner highway trooper's termination, the Court of Appeals did not need to address it in light of its holding as to the previous issue.

Appeal by Petitioner and Respondent from order entered 14 December 2012 by Judge Howard E. Manning, Jr. in Superior Court, Wake County. Heard in the Court of Appeals 22 October 2013.

*The McGuinness Law Firm, by J. Michael McGuinness, for Petitioner.*

*Attorney General Roy Cooper, by Assistant Attorney General Tamara S. Zmuda, for Respondent.*

*Richard Hattendorf for the Fraternal Order of Police, amicus curiae.*

*Richard C. Hendrix for the North Carolina Troopers Association, amicus curiae.*

McGEE, Judge.

Thomas C. Wetherington ("Petitioner") was employed as a trooper with the North Carolina State Highway Patrol ("Respondent") on 29 March 2009. A complaint was filed against Petitioner on 21 May 2009 with the Internal Affairs unit of Respondent, alleging that Petitioner had violated Respondent's Truthfulness policy. Respondent dismissed Petitioner on 4 August 2009 for violating the Truthfulness policy.

Petitioner filed a petition for a contested case hearing in the Office of Administrative Hearings on 23 October 2009, challenging his dismissal. The administrative law judge (the "ALJ"), following a hearing, concluded that the "decision to dismiss Petitioner for violations of Respondent's truthfulness policy" was supported by the evidence. The State Personnel Commission (the "SPC"), over a dissent, entered a final decision and order adopting the ALJ's decision on 2 February 2011. Petitioner filed a "Petition for Judicial Review and Notice of Appeal" on 25 February 2011 from the final decision of the SPC in Superior Court, Wake County.

The superior court reversed the final decision of the SPC on 14 December 2012. The superior court concluded that Petitioner's "unacceptable personal conduct did not rise to the level to constitute just cause for dismissal as a matter of law." The superior court also concluded, as a separate ground, that the decision to dismiss Petitioner was arbitrary and capricious.

Petitioner and Respondent appeal.

## I. Respondent's Appeal

**[1]** Respondent first argues that the "facts and circumstances in this case amount to just cause for the dismissal of Petitioner."

### A. Standard of Review

When this Court reviews appeals from superior court reversing the decision of an administrative agency, "our scope of review is twofold,

and is limited to determining: (1) whether the superior court applied the appropriate standard of review and, if so, (2) whether the superior court properly applied this standard." *Mayo v. N.C. State Univ.*, 168 N.C. App. 503, 507, 608 S.E.2d 116, 120, *aff'd per curiam*, 360 N.C. 52, 619 S.E.2d 502 (2005).

### B. Analysis

The superior court may reverse or modify the agency's decision

> if the substantial rights of the petitioners may have been prejudiced because the agency's findings, inferences, conclusions, or decisions are:
>
> (1) In violation of constitutional provisions;
>
> (2) In excess of the statutory authority or jurisdiction of the agency;
>
> (3) Made upon unlawful procedure;
>
> (4) Affected by other error of law;
>
> (5) Unsupported by substantial evidence admissible under G.S. 150B-29(a), 150B-30, or 150B-31 in view of the entire record as submitted; or
>
> (6) Arbitrary, capricious, or an abuse of discretion.

N.C. Gen. Stat. § 150B-51(b) (2009).[1]

In the present case, the superior court concluded that: (1) Petitioner's conduct "did not rise to the level to constitute just cause for dismissal as a matter of law" and (2) the decision to dismiss Petitioner was arbitrary and capricious.

The superior court's first conclusion, on just cause for dismissal, refers to an error of law in the SPC's decision. N.C.G.S. § 150B-51(b)(4) (allowing the superior court to reverse an agency's decision on the basis of an error of law). Where "the gravamen of an assigned error is that the agency violated" N.C.G.S. § 150B-51(b)(4), the superior court "engages in *de novo* review." *N.C. Dep't of Env't & Natural Res. v. Carroll*, 358 N.C. 649, 659, 599 S.E.2d 888, 895 (2004). Under the *de novo* standard

---

1. The General Assembly amended N.C.G.S. § 150B-51 in 2011 to repeal subsections (a) and (a1). 2011 N.C. Sess. Laws ch. 398 § 27. The amended statute applies only to "contested cases commenced on or after" 1 January 2012. 2011 N.C. Sess. Laws ch. 398 § 63. The petition for a contested case hearing in this case was filed 23 October 2009.

of review, the superior court "consider[s] the matter anew[] and freely substitutes its own judgment for the agency's." *Id.* at 660, 599 S.E.2d at 895 (alterations in original).

In the present case, the superior court stated that whether Petitioner's "conduct constitutes just cause for the discipline taken is a question of law and is reviewed *de novo.*" As to the first prong of our review in *Mayo,* the superior court applied the appropriate *de novo* standard of review. We proceed to the second prong in *Mayo,* whether the superior court properly applied this standard.

"Determining whether a public employer had just cause to discipline its employee requires two separate inquiries: first, whether the employee engaged in the conduct the employer alleges, and second, whether the conduct constitutes just cause" for the discipline imposed. *Carroll,* 358 N.C. at 665, 599 S.E.2d at 898 (internal quotation marks omitted). "Just cause, like justice itself, is not susceptible of precise definition. It is a flexible concept, embodying notions of equity and fairness, that can only be determined upon an examination of the facts and circumstances of each individual case." *Id.* at 669, 599 S.E.2d at 900 (internal citations and quotation marks omitted).

This Court discussed *Carroll* in *Warren v. N.C. Dep't of Crime Control,* ___ N.C. App. ___, 726 S.E.2d 920, *disc. review denied,* 366 N.C. 408, 735 S.E.2d 175 (2012). We concluded in *Warren* "that the best way to accommodate the Supreme Court's flexibility and fairness requirements for just cause is to balance the equities after the unacceptable personal conduct analysis." *Id.* at ___, 726 S.E.2d at 925.

Respondent contends that, "based on the balance of equity and fairness, and the facts and circumstances of this case, including, but not limited to, the importance of truthfulness in the [Highway] Patrol, the detailed and prolonged nature of the untruth and Petitioner's pattern and practice of being untruthful," there was just cause for dismissal of Petitioner.

i.  Whether Petitioner Engaged in the Conduct Respondent Alleges

The facts found by the ALJ and adopted by the SPC that are relevant to this issue are below:[2]

---

2.  The record contains only the odd-numbered pages of the ALJ's decision. However, the complete ALJ decision was in the appendix to Respondent's appellant brief. Parties are reminded to carefully prepare the record.

5.   On March 29, 2009, Petitioner, while on duty, observed a pickup truck pulling a boat and made a traffic stop of that truck on US 70 at approximately 10:00 pm. During that traffic stop, Petitioner discovered two loaded handguns in the truck and smelled the odor of alcohol coming from the interior of the truck. The two male occupants of the truck were cooperative and not belligerent. Petitioner took possession of the handguns. At the conclusion of that traffic stop, Petitioner proceeded to a stopped car that had pulled off to the side of the road a short distance in front of the truck and boat trailer.

6.   Petitioner testified that he first noticed his [trooper] hat missing during his approach to the car parked in front of the truck. Petitioner heard a crunch noise in the roadway and saw a burgundy eighteen-wheeler drive by.

7.   Petitioner testified that after the conclusion [of] his investigation of the stopped car, he looked for his hat. Petitioner found the gold acorns from his hat in the right hand lane near his patrol vehicle. The acorns were somewhat flattened.

. . . .

9.   After searching for, but not locating his hat, Petitioner contacted Sergeant Oglesby, his immediate supervisor, and told him that his hat blew off of his head and that he could not find it.

. . . .

11.  Trooper Rink met Petitioner on the side of the road of US 70. Trooper Rink asked Petitioner when he last saw his hat. Petitioner said he did not know. Petitioner said that he was going down the road . . . and was putting something in his seat when he realized he did not have his hat. Petitioner then indicated that he turned around and went back to the scene of the traffic stops and that is when he found the acorns from his hat. Petitioner was very upset and Trooper Rink told Petitioner that everybody loses stuff and that if Petitioner did not know what happened to his hat, then he should just tell his Sergeants that he didn't know what happened to it. Petitioner replied that it was a little late for that because he already had told his Sergeant that a truck came by and blew it off of his head.

. . . .

13. The testimony of Trooper Rink provides substantial evidence that Petitioner did not know what happened to his hat, was untruthful to Sergeant Oglesby when he said it blew off of his head, and that Petitioner's untruthfulness was willful.

. . . .

15. The next day, March 30, 2009, Sergeant Oglesby and several other members of the Patrol looked for Petitioner's hat.

16. Sergeant Oglesby had a detailed conversation with Petitioner on the side of the road regarding how the hat was lost. During the conversation, Petitioner remained consistent with his first statement to Sergeant Oglesby from the night of March 29, 2009 as he explained to Sergeant Oglesby that a gust of wind blew his hat off of his head. Petitioner continued stating that the wind was blowing from the southeast to the northwest. Petitioner said he turned back towards the direction of the roadway and saw a burgundy eighteen wheeler coming down the road so he could not run out in the roadway and retrieve his hat. Petitioner then heard a crunch and did not see his hat anymore.

. . . .

18. Petitioner was not truthful to Sergeant Oglesby on March 30, 2009, when he explained how he lost his hat.

. . . .

20. Petitioner testified that, approximately three to four days after the loss of the hat, he suddenly realized that the hat did not blow off of his head, but that he had placed the hat on the light bar of his Patrol vehicle and it blew off of the light bar. Petitioner never informed any supervisors of this sudden realization.

21. Approximately three weeks after the hat was lost, Petitioner received a telephone call from Melinda Stephens, during which Petitioner was informed that her nephew, the driver of the truck and boat trailer on March 29, 2009, had Petitioner's hat.

22. Petitioner informed Sergeant Oglesby that his hat had been found.

23. Petitioner's hat subsequently was returned to Sergeant Oglesby. When returned, the hat was in good condition and did not appear to have been run over.

24. Due to the inconsistencies in Petitioner's statements and the condition of the hat, First Sergeant Rock and Sergeant Oglesby called Petitioner to come in for a meeting. During the meeting, First Sergeant Rock asked Petitioner to clarify that the hat blew off of his head that the hat was struck by a car. Petitioner said yes. First Sergeant Rock then pulled Petitioner's hat out of the cabinet and told Petitioner that his story was not feasible because the hat did not appear to have been run over. At that point, Petitioner broke down in tears and said he wasn't sure what happened to his hat. He didn't know if it was on the trunk lid of the truck, the boat, or behind the light bar, and blew off. Petitioner stated that he told Sergeant Oglesby that the hat blew off his head because he received some bad counsel from someone regarding what he should say about how the hat was lost.

25. During his meeting with First Sergeant Rock and Sgt. Oglesby, Petitioner was untruthful when he told First Sergeant Rock that the hat blew off of his head because by Petitioner's own testimony, three days after losing his hat he realized that he placed it on his light bar. However, three weeks after the incident, in the meeting with First Sergeant Rock and Sergeant Oglesby he continued to claim that the hat blew off of his head. It wasn't until First Sergeant Rock took the hat out and questioned Petitioner more that Petitioner admitted that the hat did not blow off of his head, but blew off of the light bar. Therefore, even if Petitioner was confused on March 29, 2009, as he claims, he still was being untruthful to his Sergeants by continuing to tell them that the hat blew off of his head[.]

. . . .

33. Petitioner's untruthful statements to First Sergeant Rock and Sergeant Oglesby were willful and were made to protect himself against possible further reprimand because of leaving the patrol vehicle without his cover. (citations omitted).

The superior court concluded that evidence supported the finding that Petitioner's "untruthful conduct fell within the category of unacceptable personal conduct under the Administrative Code." Thus, the superior court answered in the affirmative the first inquiry in *Carroll*, whether the employee engaged in the alleged conduct. As to the second inquiry in *Carroll* (the third inquiry in *Warren*), whether the conduct constituted just cause, the superior court answered in the negative.

### ii. Determination as to Just Cause

"Unacceptable personal conduct does not necessarily establish just cause for all types of discipline. . . . Just cause must be determined based 'upon an examination of the facts and circumstances of each individual case.' " *Warren*, ___ N.C. App. at ___, 726 S.E.2d at 925 (quoting *Carroll*, 358 N.C. at 669, 599 S.E.2d at 900).

In the present case, Petitioner noticed his hat missing after a traffic stop. Petitioner heard a crunch in the roadway and saw an eighteen-wheeler drive by. While searching for his hat, Petitioner found the gold acorns from his hat in the right hand lane near his patrol vehicle. The acorns had become somewhat flattened. After searching for his hat, Petitioner contacted his immediate supervisor and "told him that his hat blew off of his head and that he could not find it." The ALJ found that Petitioner "was untruthful to Sergeant Oglesby when he said it blew off of his head, and that Petitioner's untruthfulness was willful."

We review this case using the "commensurate discipline approach" described in *Warren*. This Court must consider the attendant facts and circumstances in accordance with *Carroll* and *Warren*. After the unacceptable personal conduct analysis, we must "balance the equities[.]" *Warren*, ___ N.C. App. at ___, 726 S.E.2d at 925. "Although there is no bright line test" to determine whether an employee's conduct establishes just cause for discipline, "we draw guidance from those prior cases where just cause has been found." *Carroll*, 358 N.C. at 675, 599 S.E.2d at 904.

Our Supreme Court in Carroll cited cases including, *inter alia*, *Kea v. Department of Health & Human Servs.*, 153 N.C. App. 595, 570 S.E.2d 919 (2002), *aff'd per curiam*, 357 N.C. 654, 588 S.E.2d 467 (2003) (employee violated work rules, disobeyed direct order from superior, and made crude and offensive sexual advances to a co-worker) and *Davis v. N.C. Dep't of Crime Control & Pub. Safety*, 151 N.C. App. 513, 565 S.E.2d 716 (2002) (highway patrol officer was stopped for speeding and driving while intoxicated).

In *Carroll,* our Supreme Court also considered the petitioner's "extreme emotional stress of knowing that his mother, who suffered from Alzheimer's disease and had recently shown signs of congestive heart failure, was being transported to the hospital[.]" *Carroll,* 358 N.C. at 675, 599 S.E.2d at 904. Granting the "influence of the natural bonds of filial devotion" on the petitioner's emotional state and the fact that others testified they did not take personal offense with anything the petitioner did, our Supreme Court concluded that the findings do not support a conclusion that the conduct amounted to just cause for discipline. *Id.* at 675-76, 599 S.E.2d at 904.

In balancing the equities of the present case, we consider the following facts that the ALJ found and the SPC adopted, in addition to the facts already discussed in this opinion. When Petitioner's superiors confronted him about the inconsistency between his answers and the hat's condition, Petitioner "broke down in tears and said he wasn't sure what happened to his hat. He didn't know if it was on the trunk lid of the [stopped] truck, the boat, or behind the light bar, and blew off."

Petitioner further stated that "he received some bad counsel from someone regarding what he should say about how the hat was lost." Petitioner indicated he was worried about the consequences of conducting a traffic stop without wearing his hat, having been reprimanded in the past for failure to wear his hat during a traffic stop.

Respondent contends in its brief that Petitioner "made up an elaborate lie full of fabricated details" regarding the "specific direction of the wind, the specific color of the truck and the noise he heard when the truck ran over his hat." However, neither the ALJ nor the SPC made findings indicating that the wind, truck's color, or "crunch noise" were untruthful. Rather, the lie or "untruth" lay only in the hat's location when Petitioner misplaced it. The ALJ found that Petitioner "didn't know if it was on the trunk lid of the truck, the boat, or behind the light bar, and blew off." The findings do not support Respondent's characterization of Petitioner's statements as an "elaborate lie full of fabricated details[.]"

The discipline imposed upon Petitioner was dismissal. As the ALJ found, truthfulness "is paramount to the official duties of a law enforcement officer." Respondent's policy on "Truthfulness" states:

> Members shall be truthful and complete in all written and oral communications, reports, and testimony. No member shall willfully report any inaccurate, false, improper, or misleading information.

Respondent contends that "[f]rom this point forward, in every criminal case in which Petitioner is associated, the judicial finding of untruthfulness here and the facts supporting that conclusion must be disclosed to the defendant[,]" citing *Brady v. Maryland*, 373 U.S. 83, 87, 10 L. Ed. 2d 215, 218 (1963) ("suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment").

However, Respondent cites no case to this Court in which the State was required to disclose to a criminal defendant findings of an officer's untruthfulness. Assuming *arguendo*, without deciding, that the State must disclose to future criminal defendants the finding of Petitioner's untruthfulness, Respondent's contention is not entirely accurate. Respondent contends that, after this finding, Petitioner cannot perform the essential job duty of testifying "in court in an effort to hold the violator accountable for his or her actions."

However, Petitioner is not barred from testifying in court. Respondent's argument depends upon at least two assumptions that Respondent does not address: (1) that defense counsel will elect to impeach Petitioner using the finding; and (2) that defense counsel's impeachment will necessarily influence a jury to the point that a jury will disregard the entirety of Petitioner's testimony. The possibility of impeachment and the possibility of the impeachment's success must both occur in order to diminish Petitioner's performance of the duty to testify successfully. Respondent presents no argument that the likelihood of the two possibilities justifies dismissal.

Respondent concedes that a trooper is not always the sole witness to a violation of the law. Respondent points to no other essential job duties that the finding of untruthfulness would diminish or impair. Thus, excepting the above possibilities which may diminish Petitioner's performance of the duty to testify successfully, Petitioner can fulfill the duties of his office in all other respects, despite the existence of this finding.

The dissenting member of the SPC recited the following facts in concluding that Respondent "lacked just cause in this particular matter to dismiss Petitioner":

> (1) Petitioner had just conducted a stressful traffic stop immediately prior to the loss of his hat;
>
> (2) Petitioner did not attach any significance, nor was there any significance, to a hat blowing off a Trooper's head as opposed to his vehicle;

(3)  Petitioner found flattened acorns that normally are attached to a State Trooper hat and surmised that the hat had been crushed; and

(4)  Petitioner broke down into tears and admitted that he didn't know exactly what happened to the hat when his Sergeant suggested his story was not feasible.

As the superior court observed in its order, the dissenting member of the SPC concluded that "the dismissal of Petitioner did not fit the violation and was not necessary to uphold the integrity of the truthfulness policy. In short, the punishment did not fit the offense." In view of the commensurate discipline approach described in *Warren* and applied in *Carroll*, we agree. Petitioner's conduct in this case did not rise to the level described in *Kea* and *Davis, supra*. Rather, Petitioner's conduct and the existence of extenuating circumstances surrounding the conduct make this case comparable to Carroll, in which our Supreme Court concluded that the Commission lacked just cause to discipline the petitioner.

The superior court did not err in concluding that Petitioner's conduct did not constitute just cause for dismissal. Because of our conclusion as to this issue, we do not address Respondent's remaining argument.

## II.  Petitioner's Appeal

[2]  Petitioner filed a cross appeal as "an alternative basis to conclude that there was no just cause for termination[.]" In light of our holding as to the previous issue, we need not address an alternative basis to uphold the superior court's order.

Affirmed.

Judges BRYANT and STROUD concur.