IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA18-1018

Filed: 18 February 2020

Office of Administrative Hearings, No. 16 OSP 9787

THOMAS C. WETHERINGTON, Petitioner,

v.

NC DEPARTMENT OF PUBLIC SAFETY, NC HIGHWAY PATROL, Respondent.

Appeal by petitioner from order entered 17 May 2018 by Administrative Law Judge Donald W. Overby in the Office of Administrative Hearings. Heard in the Court of Appeals 7 August 2019.

The McGuinness Law Firm, by J. Michael McGuinness; Law Offices of Michael C. Byrne, by Michael C. Byrne, for petitioner-appellant.

Attorney General Joshua H. Stein, by Special Deputy Attorney General Tammera S. Hill, for respondent-appellee.

Milliken Law, by Megan A. Milliken, for Southern States Police Benevolent Association and North Carolina Police Benevolent Association, amici curiae.

Crabbe, Brown & James, LLP, by Larry H. James and Christopher R. Green, for National Fraternal Order of Police; Essex Richards, P.A., by Norris A. Adams, II, for North Carolina Fraternal Order of Police, amici curiae.

Edelstein & Payne, by M. Travis Payne, for the Professional Fire Fighters and Paramedics of North Carolina, amicus curiae.

Tin, Fulton, Walker & Owen, PLLC, by John W. Gresham, for the National Association of Police Organizations, amicus curiae.

STROUD, Judge.

It is unlikely so many lawyers have ever before written so many pages because of a lost hat. True, hats have caused serious problems in prior cases. Once a street car passenger was blinded in one eye by a hat thrown by a man quarreling with others.[1] Lost and misplaced hats have been important bits of evidence in quite a few murder and other felony cases.[2] People have suffered serious injuries trying to catch a hat.[3] As in those cases, the real issue here is far more serious than an errant hat, but that is where it started. Up to this point, this case includes over 1,000 pages of evidence, testimony, briefs, and rulings from courts, from the agency level to the Supreme Court and back to this Court for a second time. But we agree with Respondent, this matter is not just about a hat. It is about the tension between the statutorily protected rights of a law enforcement officer and proper discipline to protect the integrity and reliability of the North Carolina State Highway Patrol.

This case began in 2009 when Petitioner Wetherington, then a trooper with the North Carolina State Highway Patrol, misplaced his hat during a traffic stop; he then lied about how he lost his hat, which was later recovered, mostly intact.

---

[1] *Giblett v. Garrison*, 232 N.Y. 618, 134 N.E. 595 (1922).

[2] *Sulie v. Duckworth*, 743 F. Supp. 592, 598 (N.D. Ind. 1988), *aff'd*, 908 F.2d 975 (7th Cir. 1990); *Johnson v. State*, 289 Ga. 106, 709 S.E.2d 768 (2011); *Bower v. State*, 5 Mo. 364 (1838); *People v. Baker*, 27 A.D. 597, 50 N.Y.S. 771, (N.Y. App. Div. 1898); *Thomas v. State*, 171 Tex. Crim. 54, 344 S.W.2d 453 (1961);*Wilson v. State*, 63 Tex. Crim. 81, 138 S.W. 409 (1911); *Nelson v. State*, 52 Wis. 534, 9 N.W. 388 (1881).

[3] *Rosenberg v. Durfree*, 87 Cal. 545, 26 P. 793 (1891); *Gulf, C. & S.F. Ry. Co. v. Newson*, 45 Tex. Civ. App. 562, 102 S.W. 450 (1907).

Respondent terminated Petitioner's employment as a trooper based upon its "per se" rule that any untruthfulness by a state trooper is unacceptable personal conduct and just cause for dismissal. *See* N.C. Gen. Stat. § 126-35 (2017). In the first round of appellate review, the North Carolina Supreme Court concluded, "Colonel Glover's use of a rule requiring dismissal for all violations of the Patrol's truthfulness policy was an error of law," and remanded for Respondent to make a decision on the proper legal basis "as to whether petitioner should be dismissed based upon the facts and circumstances and without the application of a per se rule." *Wetherington v. N.C. Dep't of Pub. Safety*, 368 N.C. 583, 593, 780 S.E.2d 543, 548 (2015) (hereinafter *Wetherington I)*, *aff'd as modified*, 231 N.C. App. 503, 752 S.E.2d 511 (2013). In 2015 on remand, based upon the same evidence and facts, Respondent again determined Petitioner engaged in unacceptable personal conduct and there was just cause for his dismissal. Because Respondent failed to consider the factors as directed by the Supreme Court on remand, we again reverse and conclude as a matter of law, on *de novo* review, that Petitioner's unacceptable personal conduct was not just cause for dismissal. In accord with North Carolina General Statute § 126-34.02(a), we remand to the Office of Administrative Hearings for entry of a new order imposing some disciplinary action short of dismissal and reinstating Petitioner to the position from which he was removed.

## I.    Background

The full factual and procedural history of this case leading up to remand can be found in *Wetherington I*, 368 N.C. 583, 780 S.E.2d 543. By the time of remand from the Supreme Court, Colonel Randy Glover, who had originally terminated Petitioner's employment, had retired. In March 2013, Colonel William Grey became the Commander of the North Carolina State Highway Patrol responsible for considering the appropriate discipline for Petitioner's violation of the truthfulness policy on 28 March 2009. Col. Grey did not provide notice or a pre-dismissal conference to Petitioner, and he reviewed the existing record. On 20 May 2016, Col. Grey sent a termination letter to Petitioner. The letter states:

> Pursuant to the decision of the North Carolina Supreme Court filed on 18 December 2015, this case has been remanded back to the North Carolina Highway Patrol for me to determine, based upon the facts and circumstances of this case, whether you should be dismissed from the Highway Patrol, as previously determined by Colonel Glover, or whether you should be reinstated.
>
> This letter serves as notification of my decision to uphold your dismissal. My decision is based on my review of the Report of Investigation and attached documents, my viewing of the video recording of your interview with Internal Affairs and the evidence presented by you during your pre-dismissal conference.
>
> This case has been remanded for me to review based on a determination that Colonel Glover's earlier decision to dismiss you from the Highway Patrol was premised on a "misapprehension of the law, namely that he had no discretion over the range of discipline he could administer." Accordingly, I review this case with an open mind and with the full understanding that the range of discipline to be

administered, if any, is within my discretion and based on the unique facts and circumstances of your case.

Your dismissal was based on evidence that you provided contradictory statements about an incident in which you lost your campaign hat during a traffic stop, thereby violating the Highway Patrol's truthfulness policy. That policy, at all relevant times, stated, in pertinent part: "Members shall be truthful and complete in all written and oral communications, reports, and testimony. No member shall willfully report any inaccurate, false, improper, or misleading information."

. . . .

Consistent with the mandate of the North Carolina Supreme Court, I have reviewed the record with the understanding that I have discretion in determining what, if any, level of punishment is most appropriate based on the facts and circumstances of this case. I have considered the entire range of disciplinary actions available under state law. In that regard, I have taken into consideration the fact that you had been employed by the Highway Patrol as a Cadet and as a State Trooper from June 2007 until the time of your dismissal on August 4, 2009 that you did not have any disciplinary actions prior to the time of your dismissal and that your overall performance rating and work history since being sworn as a Trooper in November 2007 was "Good."

I am also mindful that, pursuant to *Brady v. Maryland,* 373 U.S. 83 (1963), prosecutors have constitutional obligation to disclose evidence favorable to the defendant. "Favorable evidence" includes evidence that is exculpatory as well as information that could be used to impeach the testimony of a prosecution witness. *Giglio v. U.S.*, 405 U.S. 150 (1972). Consistent with this Constitutional obligation, law enforcement agencies have a duty to disclose information to prosecutors, including a summary of Internal Affairs findings and other applicable conduct that bears on the

credibility of any witness who may testify. In federal court, the United States Attorney, in each of the three North Carolina districts, routinely requires the Highway Patrol to disclose, in writing, potential *Giglio* issues for each and every case in which a Trooper may testify. Several District Attorneys have adopted similar policies based on an understanding that the credibility of the judicial system rests on the foundation that public servants possess integrity that is beyond reproach and can be trusted to testify truthfully in every case. Despite these Constitutional concerns, I understand that not every violation of the Highway Patrol's truthfulness policy warrants dismissal.

Based upon the facts and circumstances of this case, as described above, I have no confidence that you can be trusted to be truthful to your supervisors or even to testify truthfully in court or at administrative hearings. Given that you were willing to fabricate and maintain a lie about such an insignificant fact as losing a campaign cover[4] as part of an attempt to cover up the fact that you did not wear it during an enforcement contact, I have no confidence that you would not alter material facts in court in an attempt to avoid evidence from being suppressed or for the purpose of obtaining a conviction. Even if my confidence in your ability to testify truthfully had not been lost, your ability to perform the essential job functions of a Trooper is reparably limited due to the Highway Patrol's duty to disclose details of the internal investigation to prosecutors, as discussed above. If you were to return to duty with the Highway Patrol I could not, in good conscience, assign you to any position where you may potentially have to issue a citation, make an arrest or testify in a court of law or administrative proceeding. There are no Trooper positions available within the Highway Patrol that do not include these essential job functions, accordingly, any assignment would compromise the integrity of the Highway Patrol and the ability of the State to put on credible evidence to

---

[4] Campaign cover is another term for the official hat worn by State Highway Patrol troopers.

prosecute its cases.

For the above-stated reasons, I do not find any level of discipline, short of dismissal, to be appropriate in your case. Your violation of the Highway Patrol's truthfulness policy, while over a trivial matter, does not negate the fact that your false story was created by you with premeditation and deliberation to lie to your supervisor and you continued to lie to your supervisor for a period of weeks and only decided to tell the truth after being confronted with compelling evidence that your story was untruthful. Additionally, there was no coercion, no trickery and no other mitigating circumstance present to mitigate or even explain your misconduct. Instead, the evidence shows that your fabricated an elaborate story merely because you were afraid you would possibly be reprimanded for leaving your patrol vehicle without your cover. As indicated above, I simply have no confidence that, if allowed to return to the Highway Patrol, you can be trusted to testify truthfully and having considered all mitigating factors and lesser levels of discipline, I have concluded that the appropriate level of discipline in this case is Dismissal from the North Carolina Highway Patrol.

The obligations outlined above under *Brady* and *Giglio*, as well as the high standards expected of each member of the Highway Patrol, preclude me, in my capacity as Patrol Commander, from ever allowing you to testify in court as a representative of the Highway Patrol. Therefore it is my decision to uphold your dismissal.

Petitioner received a final agency decision from Frank Perry, Secretary of the North Carolina Department of Public Safety, by a letter dated 31 August 2016. The letter stated the North Carolina Department of Public Safety Employee Advisory Committee convened and upheld his dismissal for the same reasons as stated in Col. Grey's letter. Having exhausted his administrative remedies for a second time,

Petitioner filed a second contested case petition with the Office of Administrative Hearings ("OAH") to challenge his termination. Petitioner filed motions for judgment as a matter of law, for judgment on the pleadings, and for summary judgment. These were all denied by Administrative Law Judge Donald W. Overby. A contested case hearing was held on 29-30 January 2018 before ALJ Overby.

At the 2018 hearing, all of the exhibits and testimony from the 2009 hearing were admitted. The only new witnesses were Melvin Tucker, an expert witness for Petitioner, and Col. Grey, who testified regarding his decision-making process after remand from the Supreme Court.[5] Col. Grey testified that he did not draft or prepare Petitioner's termination letter. Col. Grey also testified that he did not review the Supreme Court's decision or this Court's prior decision before making his determination regarding Petitioner's termination:

> Q. Okay. Now, at that point -- well, I would presume that you would have been provided the supreme court decision that, sort of, dumped this back in your lap?
>
> A. I never saw the supreme court decision.
>
> Q. Oh.
>
> A. I didn't review it.
>
> Q. Okay. All right. Did anyone provide you the court of appeals decision in the case right before it reached the supreme court?

---

[5] At the time of the hearing, Col. Grey had been retired from the Highway Patrol for approximately one year.

A. And I don't know -- I do -- I saw the OAH information, but I don't know that -- you know, I don't recall reviewing the court of appeals stuff.

Col. Grey was asked about this again on cross examination:

Q. Colonel, you did share with us earlier that you did not read the supreme court decision; but didn't you become aware through some source that the entire court of appeals and the superior court found there was no just cause for Trooper Wetherington's termination?

MS. HILL: Objection.

BY MR. MCGUINNESS:

Q. Did you become aware of that?

THE COURT: Overruled.

THE WITNESS: I did. At some point I understood that, I think, correct me if I'm wrong, Mr. McGuinness, that OAH was in favor of the organization, superior court and court the appeals was in favor of Mr. Wetherington, and the supreme court remanded it back to the agency. Am I right?

BY MR. MCGUINNESS:

Q. I believe you are. And I guess it just makes me curious as to why in light of the history of the case and the concerns that you've articulated that -- that you didn't get into the supreme court decision and see what particular factors that they thought was most important, not myself or Miss Hill, but the supreme court. In your, obviously, your course of actions, but you chose not to get into that, apparently?

A. That's correct.

In an order entered 17 May 2018, ALJ Overby conducted *de novo* review of whether just cause existed for Petitioner's termination and affirmed the decision to terminate Petitioner concluding in part:

> 38. Whether just cause existed for disciplinary action against a career status State employee is a question of law, to be reviewed <u>de novo</u>. In conducting that review, this Court owes no deference to DPS's just cause decision or its reasoning therefore and is free to substitute its judgment for that of the agency on whether just cause exists for the disciplinary action taken against the employee.
>
> 39. Respondent met its burden of proof and established by substantial evidence that it had just cause to dismiss Petitioner from employment with the State Highway Patrol for unacceptable personal conduct.
>
> 40. The Respondent has not exceeded its authority or jurisdiction; acted erroneously; failed to use proper procedure; acted arbitrarily or capriciously; and has not failed to act as required by law or rule.

(Citations omitted.) Petitioner timely appealed to this Court.

## II. Preliminary Procedural Issues

We first note that during the long pendency of this case, the procedure for this appeal has changed.

### A. Jurisdiction

The appeal process under North Carolina General Statute Chapter 126, Article 8 for Petitioner's case changed as of 21 August 2013, when amendments to North Carolina General Statute Chapter § 126-34.02 became effective.

Once a final agency decision is issued, a potential, current, or former State employee may appeal an adverse employment action as a contested case pursuant to the method provided in N.C. Gen. Stat. § 126-34.02 (2015). As relevant to the present case, N.C. Gen. Stat. § 126-34.02(a) provides:

> (a) [A] former State employee may file a contested case in the Office of Administrative Hearings under Article 3 of Chapter 150B of the General Statutes. . . . In deciding cases under this section, the [ALJ] may grant the following relief:
>
> > (1) Reinstate any employee to the position from which the employee has been removed.
> >
> > (2) Order the employment, promotion, transfer, or salary adjustment of any individual to whom it has been wrongfully denied.
> >
> > (3) Direct other suitable action to correct the abuse which may include the requirement of payment for any loss of salary which has resulted from the improper action of the appointing authority.

One of the issues, which may be heard as a contested case under this statute, is whether just cause existed for dismissal, demotion, or suspension. As here, "[a] career State employee may allege that he or she was dismissed, demoted, or suspended for disciplinary reasons without just cause." N.C. Gen. Stat. § 126-34.02(b)(3). In such cases, "the burden of showing that a career State employee was discharged, demoted, or suspended for just cause rests with the employer." N.C. Gen. Stat. § 126-34.02(d). In a contested case, an "aggrieved party" is entitled to judicial review of a final decision of an administrative law judge [ALJ] by appeal directly to this Court. N.C. Gen. Stat. § 126-34.02(a); N.C. Gen. Stat. § 7A-29(a).

*Harris v. N.C. Dep't of Pub. Safety*, 252 N.C. App. 94, 98, 798 S.E.2d 127, 131-32,

*aff'd*, 370 N.C. 386, 808 S.E.2d 142 (2017) (alterations in original).

The amendments in 2013 eliminated one step in appellate review, so there was no Superior Court review of the OAH decision after remand by the Supreme Court, as there was in *Wetherington I.* Neither party has raised any challenges to the procedure on remand. Petitioner timely appealed the ruling from the OAH to this Court pursuant to North Carolina General Statute § 126-34.02(a) and North Carolina General Statute § 7A-29(a). *See Peterson v. Caswell Developmental Ctr.,* ___ N.C. App. ___, ___, 814 S.E.2d 590, 593 (2018) ("An appeal lies with this Court of a final decision of the Office of Administrative Hearings pursuant to N.C. Gen. Stat. § 7A-29 (2017).").

B.    Standard of Review

Section 150B-51 of our State's Administrative Procedure Act (APA) establishes the scope and standard of review that we apply to the final decision of an administrative agency. The APA authorizes this Court to affirm or remand an ALJ's final decision, but such a decision may be reversed or modified only
> if the substantial rights of the petitioners may have been prejudiced because the findings, inferences, conclusions, or decisions are:
> (1) In violation of constitutional provisions;
> (2) In excess of the statutory authority or jurisdiction of the agency or [ALJ];
> (3) Made upon unlawful procedure;
> (4) Affected by other error of law;
> (5) Unsupported by substantial evidence admissible under G.S. 150B-29(a), 150B-30, or 150B-31 in view of the entire record as submitted; or

(6) Arbitrary, capricious, or an abuse of discretion.

The particular standard applied to issues on appeal depends upon the nature of the error asserted. "It is well settled that in cases appealed from administrative tribunals, questions of law receive *de novo* review, whereas fact-intensive issues such as sufficiency of the evidence to support an agency's decision are reviewed under the whole-record test."

To that end, we review *de novo* errors asserted under subsections 150B-51(b)(1)-(4). Under the *de novo* standard of review, the reviewing court "considers the matter anew and freely substitutes its own judgment[.]"

When the error asserted falls within subsections 150B-51(b)(5) and (6), this Court must apply the "whole record standard of review." Under the whole record test,

> [the reviewing court] may not substitute its judgment for the agency's as between two conflicting views, even though it could reasonably have reached a different result had it reviewed the matter de novo. Rather, a court must examine all the record evidence—that which detracts from the agency's findings and conclusions as well as that which tends to support them—to determine whether there is substantial evidence to justify the agency's decision.

"'Substantial evidence' means relevant evidence a reasonable mind might accept as adequate to support a conclusion."

"In a contested case under the APA, as in a legal proceeding initiated in District or Superior Court, there is but one fact-finding hearing of record when witness demeanor may be directly observed." It is also well established that

> [i]n an administrative proceeding, it is the prerogative and duty of [the ALJ], once all the evidence has been presented and considered, to determine the weight and sufficiency of the evidence and the credibility of the witnesses,

> to draw inferences from the facts, and to appraise conflicting and circumstantial evidence. The credibility of witnesses and the probative value of particular testimony are for the [ALJ] to determine, and [the ALJ] may accept or reject in whole or part the testimony of any witness.

Our review, therefore, must be undertaken "with a high degree of deference" as to "'[t]he credibility of witnesses and the probative value of particular testimony[.]'" As our Supreme Court has explained, "the ALJ who conducts a contested case hearing possesses those institutional advantages that make it appropriate for a reviewing court to defer to his or her findings of fact."

*Brewington v. N.C. Dep't of Pub. Safety*, 254 N.C. App. 1, 12-13, 802 S.E.2d 115, 124-25 (2017) (alterations in original) (citations omitted), *review denied*, 371 N.C. 343, 813 S.E.2d 857 (2018).

The primary issue on appeal is whether the OAH erred in upholding Col. Grey's determination of "just cause" to terminate Petitioner's employment.

> Career state employees are entitled to statutory protections, including the protection from being discharged, suspended, or demoted without "just cause." This Court established a three-part analysis to determine whether just cause existed for an employee's adverse employment action for unacceptable personal conduct:
>
> > The proper analytical approach is to first determine whether the employee engaged in the conduct the employer alleges. The second inquiry is whether the employee's conduct falls within one of the categories of unacceptable personal conduct provided by the Administrative Code. Unacceptable personal conduct does not necessarily establish just cause for all types of discipline.

> If the employee's act qualifies as a type of unacceptable conduct, the tribunal proceeds to the third inquiry: whether that misconduct amounted to just cause for the disciplinary action taken. Just cause must be determined based "upon an examination of the facts and circumstances of each individual case."
> Here, only the third prong of the analysis is at issue, as the ALJ concluded, and Petitioner did not appeal, the first two findings that Petitioner had engaged in the alleged unacceptable personal conduct and that conduct fell within one of the provided categories.

*Peterson*, ___ N.C. App.at ___, 814 S.E.2d at 593 (citation omitted) (quoting *Warren v. N.C. Dep't of Crime Control*, 221 N.C. App. 376, 383, 726 S.E.2d 920, 925 (2012)).

Here, as in *Peterson*, only the "third inquiry" is challenged on appeal, and we review the conclusion of "just cause" *de novo*. "Under the *de novo* standard of review, the trial court considers the matter anew and freely substitutes its own judgment for the agency's." *Wetherington I*, 368 N.C. at 590, 780 S.E.2d at 546 (citation and brackets omitted).

C.     Law of the Case

This case's long history adds another layer of complication. Our review of the order on appeal is guided both by the standard of review and by the prior rulings in this case under the law of the case doctrine.

> According to the doctrine of the law of the case, once an appellate court has ruled on a question, that decision becomes the law of the case and governs the question both in subsequent proceedings in a trial court and on subsequent appeal.

*Weston v. Carolina Medicorp,* 113 N.C. App. 415, 417, 438 S.E.2d 751, 753 (1994)

(citing *Transportation, Inc. v. Strick Corp.*, 286 N.C. 235, 210 S.E.2d 181 (1974)).

The law of the case doctrine applies only to the issues decided in the previous

proceeding.

> In North Carolina courts, the law of the case applies only to issues that were decided in the former proceeding, whether explicitly or by necessary implication, but not to questions which might have been decided but were not. "[T]he doctrine of the law of the case contemplates only such points as are actually presented and necessarily involved in determining the case."

*Goldston v. State*, 199 N.C. App. 618, 624, 683 S.E.2d 237, 242 (2009) (alteration in

original) (quoting Hayes v. Wilmington, 243 N.C. 525, 536, 91 S.E.2d 673, 682 (1956)),

*aff'd by an equally divided court*, 364 N.C. 416, 700 S.E.2d 223 (2010).

In his Petition for a Contested Case Hearing filed after Col. Grey issued his

determination on remand, Petitioner argued, "The law of the case controls[,]" citing

to *Wetherington I*. In *Wetherington I*, the Supreme Court notably did not reverse or

vacate either the Superior Court's order or this Court's opinion, which was affirmed

as modified. *See Wetherington I*, 368 N.C. at 593, 780 S.E.2d at 548-49. In addition,

the Superior Court's order and this Court's opinion reversed ALJ Gray's order which

was on appeal in *Wetherington I*. The Supreme Court instead held:

> Nevertheless, the superior court determined that petitioner's conduct did not constitute just cause for dismissal, and the Court of Appeals affirmed that

> determination. Because we conclude that Colonel Glover's use of a rule requiring dismissal for all violations of the Patrol's truthfulness policy was an error of law, we find it prudent to remand this matter for a decision by the employing agency as to whether petitioner should be dismissed based upon the facts and circumstances and without the application of a per se rule. As a result, we do not decide whether petitioner's conduct constitutes just cause for dismissal.
>
> Accordingly, the decision of the Court of Appeals is modified and affirmed, and the case is remanded to the Court of Appeals with instructions to that court to remand to the Superior Court, Wake County for subsequent remand to the SPC and further remand to the employing agency for additional proceedings not inconsistent with this opinion.

*Id.* at 593, 780 S.E.2d at 548 (citation omitted). Therefore, the Supreme Court modified this Court's opinion in *Wetherington I* only regarding this Court's holding, which was, "The superior court did not err in concluding that Petitioner's conduct did not constitute just cause for dismissal." 231 N.C. App. at 513, 752 S.E.2d at 517.

As ALJ Overby noted, the basic facts as to the traffic stop in 2009, the loss of the hat, and Petitioner's statements about it were determined in *Wetherington I*. The remand by the Supreme Court did not limit Respondent's options on remand but gave Respondent the *opportunity* to develop additional evidence as to those events in 2009, to amend its charges against Petitioner, and to present additional substantive evidence at another contested case hearing. *See Wetherington I*, 368 N.C. at 593, 780 S.E.2d at 548-49. Since the Supreme Court was considering a legal issue, the holding and open-ended remand gave Respondent at least two options. One option was for

Respondent to pursue amended charges or consider additional evidence on remand, if it determined the facts required further development. *See N.C. Dep't of Env't & Nat. Res. v. Carroll,* 358 N.C. 649, 674-75, 599 S.E.2d 888, 904 (2004) ("Ordinarily, when an agency fails to make a material finding of fact or resolve a material conflict in the evidence, the case must be remanded to the agency for a proper finding."). Another option, which Respondent elected, was to proceed upon the same evidence and facts as established in *Wetherington I* regarding the events in 2009 and to make a new determination of "whether petitioner's conduct constitutes just cause for dismissal" based upon the specific factors as directed by the Supreme Court. *See Wetherington I*, 368 N.C. at 593, 780 S.E.2d at 548.

D.     Adjudicated Facts

At the second contested case hearing, no new substantive evidence regarding the facts surrounding the loss of the hat was presented. The transcripts and exhibits from the first hearing were all admitted into evidence. In the order, ALJ Overby noted that both the Court of Appeal and Supreme Court in *Wetherington I* had quoted "fifteen specific findings of fact" from the prior order which were not "successfully challenged on appeal" in *Wetherington I* and "thus are conclusively established on

appeal."[6] "[T]he established and settled facts of the underlying events for which Petitioner was terminated" quoted by the Supreme Court in *Wetherington I* are:

> 5. On March 29, 2009, Petitioner, while on duty, observed a pickup truck pulling a boat and made a traffic stop of that truck on U.S. 70 at approximately 10:00 pm. During that traffic stop, Petitioner discovered two loaded handguns in the truck and smelled the odor of alcohol coming from the interior of the truck. The two male occupants of the truck were cooperative and not belligerent. Petitioner took possession of the handguns. At the conclusion of that traffic stop, Petitioner proceeded to a stopped car that had pulled off to the side of the road a short distance in front of the truck and boat trailer.

> 6. Petitioner testified that he first noticed his hat missing during his approach to the car parked in front of the truck. Petitioner heard a crunch noise in the roadway and saw a burgundy eighteen-wheeler drive by.

> 7. Petitioner testified that after the conclusion [of] his investigation of the stopped car, he looked for his hat. Petitioner found the gold acorns from his hat in the right hand lane near his patrol vehicle. The acorns were somewhat flattened.

> . . . .

> 9. After searching for, but not locating his hat, Petitioner contacted Sergeant Oglesby, his immediate supervisor, and told him that his hat blew off of his head and that he could not find it.

---

[6] These findings were in ALJ Beecher Gray's order based upon the 2009 hearing. It is true that these findings are the "established and settled facts," although the Superior Court and this Court *reversed* ALJ Gray's order in *Wetherington I* based upon *de novo* review of the "just cause" conclusion. Petitioner challenges some of these "adjudicated facts" on appeal as unsupported by substantial evidence. There are good arguments both ways on whether this Court would be able to review those facts on appeal or if they are part of the law of the case. But based upon our analysis of the case, we need not address this portion of Petitioner's argument.

. . . .

11. Trooper Rink met Petitioner on the side of the road of U.S. 70. Trooper Rink asked Petitioner when he last saw his hat. Petitioner said he did not know. . . . Petitioner said that he was going down the road . . . and was putting something in his seat when he realized he did not have his hat. Petitioner then indicated that he turned around and went back to the scene of the traffic stops and that is when he found the acorns from his hat. Petitioner was very upset and Trooper Rink told Petitioner that everybody loses stuff and that if Petitioner did not know what happened to his hat, then he should just tell his Sergeants that he didn't know what happened to it. Petitioner replied that it was a little late for that because he already had told his Sergeant that a truck came by and blew it off of his head.

. . . .

13. The testimony of Trooper Rink provides substantial evidence that Petitioner did not know what happened to his hat, was untruthful to Sergeant Oglesby when he said it blew off of his head, and that Petitioner's untruthfulness was willful.

. . . .

15. The next day, March 30, 2009, Sergeant Oglesby and several other members of the Patrol looked for Petitioner's hat.

16. Sergeant Oglesby had a detailed conversation with Petitioner on the side of the road regarding how the hat was lost. During the conversation, Petitioner remained consistent with his first statement to Sergeant Oglesby from the night of March 29, 2009 as he explained to Sergeant Oglesby that a gust of wind blew his hat off of his head. Petitioner continued stating that the wind was

blowing from the southeast to the northwest. Petitioner said he turned back towards the direction of the roadway and saw a burgundy eighteen[-]wheeler coming down the road so he could not run out in the roadway and retrieve his hat. Petitioner then heard a crunch and did not see his hat anymore.

. . . .

18. Petitioner was not truthful to Sergeant Oglesby on March 30, 2009, when he explained how he lost his hat.

. . . .

20. Petitioner testified that, approximately three to four days after the loss of the hat, he suddenly realized that the hat did not blow off of his head, but that he had placed the hat on the light bar of his Patrol vehicle and it blew off of the light bar. Petitioner never informed any supervisors of this sudden realization.

21. Approximately three weeks after the hat was lost, Petitioner received a telephone call from Melinda Stephens, during which Petitioner was informed that her nephew, the driver of the truck and boat trailer on March 29, 2009, had Petitioner's hat.

22. Petitioner informed Sergeant Oglesby that his hat had been found.

23. Petitioner's hat subsequently was returned to Sergeant Oglesby. When returned, the hat was in good condition and did not appear to have been run over.[7]

---

[7] As noted in Finding 7, "Petitioner found the gold acorns from his hat in the right hand lane near his patrol vehicle. The acorns were somewhat flattened." *Wetherington I*, 368 N.C. at 586, 780 S.E.2d at 544. When the hat was recovered, the acorns were missing from the hat, but it was not crushed. Thus, the hat had not been run over by an eighteen-wheeler—at least not to the point the hat was destroyed. There was some debate at the hearing over whether a hat without acorns is in "good condition." For purposes of this opinion, we assume so.

24. Due to the inconsistencies in Petitioner's statements and the condition of the hat, First Sergeant Rock and Sergeant Oglesby called Petitioner to come in for a meeting. During the meeting, First Sergeant Rock asked Petitioner to clarify that the hat blew off of his head and that the hat was struck by a car. Petitioner said yes. First Sergeant Rock then pulled Petitioner's hat out of the cabinet and told Petitioner that his story was not feasible because the hat did not appear to have been run over. At that point, Petitioner broke down in tears and said he wasn't sure what happened to his hat. He didn't know if it was on the trunk lid of the truck, the boat, or behind the light bar, and blew off. Petitioner stated that he told Sergeant Oglesby that the hat blew off his head because he received some bad counsel from someone regarding what he should say about how the hat was lost.

25. During his meeting with First Sergeant Rock and Sgt. Oglesby, Petitioner was untruthful when he told First Sergeant Rock that the hat blew off of his head because by Petitioner's own testimony, three days after losing his hat he realized that he placed it on his light bar. However, three weeks after the incident, in the meeting with First Sergeant Rock and Sergeant Oglesby he continued to claim that the hat blew off of his head. It wasn't until First Sergeant Rock took the hat out and questioned Petitioner more that Petitioner admitted that the hat did not blow off of his head, but blew off of the light bar. Therefore, even if Petitioner was confused on March 29, 2009, as he claims, he still was being untruthful to his Sergeants by continuing to tell them that the hat blew off of his head . . . .

. . . .

33. Petitioner's untruthful statements to First Sergeant Rock and Sergeant Oglesby were willful and were made to protect himself against possible further reprimand because of leaving the patrol vehicle without his cover.

*Wetherington I*, 368 N.C. at 585-88, 780 S.E.2d at 544-46 (alterations in original).

### III.   New Findings of Fact on Remand

ALJ Overby made additional findings of fact regarding Col. Grey's consideration on remand. Many of these findings did not exist before remand and were not addressed in *Wetherington I*, although some are essentially reiterations of the "adjudicated facts" regarding events in 2009 and some are actually conclusions of law. We will refer to these new findings as the "remand findings" to distinguish them from the "adjudicated facts." Petitioner challenges some of the remand findings as unsupported by substantial evidence.[8]

> 8.   Col. Grey's termination letter is very specific about what he reviewed in making his decision. He considered the Report of Investigation and attached documents, the video recording of Petitioner's interview with Internal Affairs, and the evidence presented by Petitioner during his pre-dismissal conference.
>
> 9.   In the letter, Col. Grey recognizes that he has discretion to administer any level of punishment. He acknowledges mitigating factors, including Petitioner's work history.
>
> 10.   There are four enumerated facts that the Colonel recites as the basis of his decision to terminate. Those facts, as set forth in the letter, are consistent with the Facts as found by ALJ Gray. Within the four enumerated facts, Col. Grey states his conclusions regarding the facts as he recites the proven facts as the basis for his decision.

---

[8] Petitioner challenges Findings 15, 17, 18, 28, 29, 30, 32, 34, 35, 36, 47, 48, 60, 62, 64, 65, and 66. We address the arguments as to specific findings as appropriate below.

11.  Col. Grey states that Petitioner violated the Patrol's truthfulness policy by making contradictory statements (plural) about how he lost his campaign cover.

. . . .

14.  Col. Grey did not write the termination letter, and he does not know who wrote the letter. It was given to him to sign.

15.  It is not of consequence that Col. Grey did not write the dismissal letter.  By signing the letter, he is taking full responsibility and ownership for its contents. Likewise, Col. Grey did not need to be fully aware of Col. Glover's testimony because Col. Grey was reviewing the file and drawing his own conclusions from the full record in the hearing.

16.  Trooper Wetherington's employment was terminated based on the allegations of untruthfulness. Petitioner's untruthful statements were about where his hat was physically located when it was blown away from his care and control.

17.  Wetherington initially stated his hat blew off his head and became lost during a traffic stop, and that is what he reported to his supervisor, Sergeant Oglesby, knowing that statement not to be true.

18.  From the Adjudicated Facts of this case, Petitioner Wetherington sought counsel from someone who suggested what he should say about the lost hat, after which he called Sgt. Oglesby. He then talked with Trooper Rink who counseled him to tell the truth, but Petitioner told Trooper Rink that it was too late because he had already told Sgt. Oglesby a story that was not true. Petitioner continued to maintain his untrue statements until confronted with the return of his campaign cover, i.e., hat.

19. According to Petitioner Wetherington, he had a sudden realization three to four days later of the hat's actual location when he lost it but never informed any of his superiors of that revelation.

20. It has been practically a universally held opinion, including Col. Grey, that the underlying premise of a lost campaign cover in and of itself was not a significant violation. The issue pertains to Petitioner's untruthfulness.

. . . .

23. The remand hearing before the undersigned primarily focused on Col. Grey's decision, including his application of the just cause factors required by North Carolina's just cause law. Two witnesses testified at the remand hearing on January 29 and 30, 2018, Col. William Grey for the Respondent and retired Chief Melvin Tucker for Petitioner.

. . . .

25. At the time of the hearing, Col. Grey was still familiar with the policies of the SHP. The policy on truthfulness, he remembered, was fairly simple: "You're just required to be truthful in all your communications whether they're oral or written at all times."

26. As the commander of the SHP, Col. Grey felt that truthfulness was paramount, not just for the SHP, but for all law enforcement:

> [Y]ou gotta have trust that a person is credible, has moral courage to step up and do the right thing and is going to be honest and forthright in all their communications…. You take people's freedoms, you're gonna charge them with stuff and in a worst case scenario, you can-you can take their life, if the situation

calls for it, so you got [to] be sure that person is always aboveboard and forthright.

27. During his tenure as Colonel, Col. Grey disciplined members of SHP. He gave the full range of discipline from written warnings to days off to dismissals. In making his decision to discipline a member, it was Col. Grey's practice to review the entire case, including the internal affairs investigation and the member's work history, and he would make a decision based on the totality of the circumstances surrounding the case.

28. Col. Grey received this case after the Supreme Court ruled to remand the matter for decision. Col. Grey never read the Supreme Court decision in this contested case; however, it was explained to him. As he understood the Supreme Court ruling, he was to review the case as if for the first time and make his decision from the evidence presented.

29. Col. Grey did not have to read the Supreme Court decision to understand the full import of all of its holdings. The provisions of the decision were explained to him in sufficient detail for him to properly consider the provisions of the Supreme Court decision in conducting the review and making his decision in this contested case.

30. Over the course of a few days, Col. Grey reviewed the recordings, transcripts, internal investigation report, and pre-disciplinary information, as well as Petitioner's work history and disciplinary history. Col. Grey treated this case like any other case coming to him for the first time.

31. Col. Grey did not know Petitioner and had never worked with him at SHP. Col. Grey did not speak with Petitioner during his review of Petitioner's case. This was not unusual since he did not usually speak with members prior to issuing discipline. He would only review the information presented to him after the pre-disciplinary

conference just as he did with Petitioner's case.

32. Col. Grey determined Petitioner's dismissal was appropriate based on Petitioner's violation of the truthfulness policy. It was not a "spontaneous lie." Rather, Petitioner "had time to think about it, he thought about it, and then he called his sergeant and told him a lie, knowing that it was untrue, and then he changed his story from his first statement to a second statement." It was not until he was confronted with the truth that Petitioner finally admitted: "Okay, I'm not telling the truth."

33. Col. Grey considered evidence of mitigation, as well as all other forms of discipline available to him, but decided that dismissal was the most appropriate discipline given Petitioner's conduct. Col. Grey made his decision without regard for what the Secretary of the Department of Public Safety or anyone else wanted. He was not pressured to dismiss Petitioner.

34. Col. Grey did not feel that the matter was "just about a hat." Instead, the Colonel was bothered that Petitioner was willing to go to such lengths to lie about an event when there was not "a whole lot on the line there." Had Petitioner been truthful and confessed that he simply did not know what happened to his hat, the Colonel likely would not have known about it, because it would not rise to the level of his review. Petitioner would most likely have been given a written warning or a counseling.

35. Col. Grey felt that the fact that Petitioner had just concluded a "high-intensity" yet routine traffic stop does not negate the fact that Petitioner intentionally lied to his sergeant about how he lost his hat. Col. Grey also felt that the fact that Petitioner was a relatively new trooper does not negate the fact that he intentionally lied to his sergeant and continued to maintain the lie. While it might be expected that less experienced troopers will make more technical mistakes, the same cannot be said for moral mistakes, according to Col. Grey.

36. The fact that Petitioner was willing to lie about such a relatively small thing as losing his hat caused Col. Grey to lose confidence in the integrity of Petitioner. This is consistent with the findings in the Recommended Decision by Judge Gray, which speaks of the widely held position with the Highway Patrol and not just Colonel Glover's position of a *per se* violation. For Col. Grey to reach that conclusion is not a new allegation, but a finding based upon the facts and circumstances existing in the 2009 case as found by Judge Gray.

. . . .

52. The transcript of the first OAH hearing shows that Trooper Wetherington was 23 years old at the time of the first hearing. He graduated from New Bern High School in 2005. Wetherington was a volunteer firefighter and an American Red Cross Instructor. Wetherington graduated from the Highway Patrol Academy in 2007.

53. According to that transcript, Wetherington was not previously disciplined by SHP. Wetherington was rated as one of the highest producers while in the field training program. His work and conduct history revealed exemplary service and conduct. In his 2008-2009 evaluation, Trooper Wetherington was rated as good or very good in every rating category. Judge Gray found that Wetherington's overall performance rating in 2008 was "3," which was average. Colonel Grey was aware of Wetherington's work history.

54. *The Employee Advisory Committee* report found that Wetherington was a very "devoted, dedicated" Trooper, and unanimously recommended reinstatement. Colonel Grey was aware of the Committee report.

55. The record of this contested case reflects that several laypersons and some of Wetherington's supervisors testified before Judge Gray in the first hearing at OAH. They testified to Wetherington's excellent work

performance, character, and conduct. This Tribunal did not hear their testimony and therefore is unable to assess the credibility of their individual testimonies by taking into account the appropriate factors generally used for determining credibility. Their testimony is considered and given the appropriate weight.

56. Likewise, seven letters were written on Petitioner's behalf. Two of the authors also appeared and testified before Judge Gray. The letters have been considered.

57. The circumstances of the traffic stop wherein the hat was lost was also considered by Col. Grey and the undersigned. It is noted that there were two occupants in the truck he stopped, that there was an odor of alcohol, and that there were two guns in the truck. The guns were removed, and the occupants were cooperative and were released without incident.

. . .

58. Disparate treatment is a factor which may be considered in assessing discipline.

59. The issue of disparate treatment was raised in the OAH hearing before Judge Gray in 2009. Judge Gray made specific Findings of Fact concerning disparate treatment.

60. In 2009, Judge Gray, in Finding No. 43, found that substantial evidence existed that "since at least 2002 all members of the Patrol with substantiated violations of truthfulness have been dismissed."

61. Judge Gray concluded then that it was not incumbent on the Highway Patrol to look back through history to find a lowest common denominator for assessing punishment from the historical point forward. There is no evidence of cases of disparate treatment more recent in

time before this Tribunal for determining the most recent punishment by the Patrol for violation of the truthfulness policy; however, this Tribunal is not going to reach back into history in order to compare Petitioner's case with similar cases from several years ago, without any recent cases for comparison, and especially cases decided by Col. Grey.

62. This current case was decided by Col. Grey in 2016. It is not fair or reasonable to hold the Highway Patrol to a standard set by disposition of its worse cases from many years before. Col. Grey decided the case based upon his thorough review of the totality of facts and circumstances of this case, including how he had disposed of cases during his tenure as Colonel. Col. Grey acknowledged that he reviewed only cases decided during his tenure.

. . .

63. Petitioner Wetherington contends that Col. Grey's reliance on the Brady and Giglio cases is tantamount to inserting a new allegation of sorts that should not have been brought into consideration in this current review on remand.

64. The undersigned excluded evidence on the Brady and Giglio cases, at least in part, out of an abundance of caution, to avoid evidence that would indeed constitute a totally new allegation not within the purview of the original charge sheet. On further review, Col. Grey's reliance on Brady and Giglio was not ill-founded. Brady was decided by the Supreme Court of the United States in 1963, and Giglio was decided by the Supreme Court of the United States in 1973, well before even the first hearing in OAR on this matter.

65. Assuming *arguendo* that Col. Grey should not have referenced specifically to those cases, Col. Glover had considered the impact of findings of untruthfulness with

Highway Patrol Troopers as reflected in his testimony. Further, in upholding Col. Glover's decision to terminate Petitioner, Secretary Reuben Young referenced the effect of a Trooper having his honesty, integrity and truthfulness questioned, especially from the witness stand. Thus, Col. Grey's reliance on the impact of loss of credibility for untruthfulness would have been in keeping with the initial determinations in this case, including Col. Glover's testimony in the first hearing before OAR.

66. Col. Grey's reliance on the <u>Brady/Giglio</u> factors was directly related to Petitioner's actions which were the cause of his termination, and referenced in Col. Glover's very abbreviated dismissal letter and the original Charge Sheet.

(Citations and parentheticals omitted) (alterations in finding 26 in original.)

IV.     Just Cause

Petitioner first argues on appeal that DPS did not follow the instructions from the North Carolina Supreme Court regarding factors to consider on remand. Respondent contends that "[d]espite the numerous argument headings in Petitioner's brief, there is solely one issue before this Court: the existence of just cause to affirm Petitioner's dismissal." We review whether just cause existed to terminate Petitioner *de novo*. *See Peterson*, ___ N.C. App. at ___, 814 S.E.2d at 593.

As this Court noted in *Warren v. North Carolina Department of Crime Control*:

We conclude that the best way to accommodate the Supreme Court's flexibility and fairness requirements for just cause is to balance the equities after the unacceptable personal conduct analysis. This avoids contorting the language of the Administrative Code defining unacceptable personal conduct. The proper analytical approach is to first

determine whether the employee engaged in the conduct the employer alleges. The second inquiry is whether the employee's conduct falls within one of the categories of unacceptable personal conduct provided by the Administrative Code. Unacceptable personal conduct does not necessarily establish just cause for all types of discipline. If the employee's act qualifies as a type of unacceptable conduct, the tribunal proceeds to the third inquiry: whether that misconduct amounted to just cause for the disciplinary action taken. Just cause must be determined based "upon an examination of the facts and circumstances of each individual case."

221 N.C. App. 376, 382-83, 726 S.E.2d 920, 925 (2012) (footnote omitted) (quoting

*Carroll*, 358 N.C. at 669, 599 S.E.2d at 900).

In *Wetherington I*, the Supreme Court noted Col. Glover's testimony that

because petitioner's conduct "was obviously a violation of the truthfulness policy," dismissal was required, and he repeatedly asserted that he "had no choice" to impose any lesser punishment. After petitioner's counsel asked Colonel Glover whether, "when there is a substantiated or adjudicated finding of untruthfulness . . . [a trooper] would necessarily need to be terminated," Colonel Glover reiterated that if "that's the violation, again . . . I have no choice because that's the way I view it." Petitioner's counsel then asked, "[D]oes that mean if you find a substantiated or adjudicated violation of the truthfulness policy . . . that you don't feel like that gives you any discretion as Colonel to do anything less than termination?" Colonel Glover agreed with that statement.

368 N.C. at 592, 780 S.E.2d at 548 (alterations in original). The Supreme Court then

noted that the "truthfulness policy" applies to a wide range of communications,

whether related to the trooper's duties or not, but as Col. Glover described his

application of that policy, any untruthful or inaccurate statement, in any context, required termination:

> As written, the truthfulness policy applies to "all written and oral communications," and it applies to a wide range of untruthful, inaccurate, "improper," or "misleading" statements. Nothing in the text of the policy limits its application to statements related to the trooper's duties, the Patrol's official business, or any other significant subject matter. Notwithstanding the potentially expansive scope of this policy, Colonel Glover confirmed that he could not impose a punishment other than dismissal for any violation, apparently regardless of factors such as the severity of the violation, the subject matter involved, the resulting harm, the trooper's work history, or discipline imposed in other cases involving similar violations. We emphasize that consideration of these factors is an appropriate and necessary component of a decision to impose discipline upon a career State employee for unacceptable personal conduct.

*Id.*

The Supreme Court rejected the "per se" rule of dismissal for any violation of the truthfulness policy. *Id.* at 593, 780 S.E.2d at 548. Although Respondent had discretion in choosing an appropriate punishment for violation of the policy, that discretion was to be guided by consideration of certain factors outlined by the Supreme Court. Specifically, on remand, DPS was required to consider

> the severity of the violation, the subject matter involved, the resulting harm, the trooper's work history, or discipline imposed in other cases involving similar violations. We emphasize that consideration of these factors is an appropriate and necessary component of a decision to impose discipline upon a career State employee for

unacceptable personal conduct.

*Id.* at 592, 780 S.E.2d at 548. The Supreme Court also noted that Respondent should

consider a "range of disciplinary actions" and not just termination:

> While dismissal may be a reasonable course of action for
> dishonest conduct, *the better practice, in keeping with the
> mandates of both Chapter 126 and our precedents, would
> be to allow for a range of disciplinary actions in response to
> an individual act of untruthfulness, rather than the
> categorical approach employed by management in this case.*

*Id.* at 593, 780 S.E.2d at 548 (emphasis added).

On remand, the Supreme Court did not limit DPS to relying on the existing

record. *Id.* The ALJ found that "[t]he Supreme Court's directive is specifically

sending this matter back to the agency to make a determination based on the facts

and circumstances of this case. The directive does not indicate that an entirely new

investigation should be undertaken." We agree the Supreme Court did not direct "an

entirely new investigation" but it also did not preclude Respondent from conducting

further investigation or from developing additional evidence as needed to address the

factors as directed by the Supreme Court.[9] In any event, Respondent elected to rely

---

[9] Since the Supreme Court was reviewing "just cause" *de novo*, it could have performed that review based upon the existing record in *Wetherington I* without remand, but because Respondent had erroneously applied a "per se" rule of dismissal, the Supreme Court gave Respondent the opportunity on remand to develop the record as to the additional factors it had directed Respondent to consider and to exercise its discretion accordingly. We also agree with the ALJ that if Respondent had considered new evidence, "then such new allegations would have necessitated procedural due process, including, among other things, written notice and an opportunity to be heard in a pre-dismissal conference." But Respondent elected to rely on the existing record, so another pre-dismissal conference was not required.

only on the existing record, so all the evidence and facts as to the events in 2009 are exactly the same as considered by this Court and the Supreme Court in *Wetherington I.* Only the findings on remand as to Col. Grey's decision are new, and many of these findings are actually reiterations of the 2009 "adjudicated facts" or conclusions of law, which we will review as such.

Petitioner argues, and ALJ Overby found, that Col. Grey did not read either the opinions issued by the Court of Appeals or Supreme Court in *Wetherington I*:

> 28. Col. Grey received this case after the Supreme Court ruled to remand the matter for decision. Col. Grey never read the Supreme Court decision in this contested case; however, it was explained to him. As he understood the Supreme Court ruling, he was to review the case as if for the first time and make his decision from the evidence presented.
>
> 29. Col. Grey did not have to read the Supreme Court decision to understand the full import of all of its holdings. The provisions of the decision were explained to him in sufficient detail for him to properly consider the provisions of the Supreme Court decision in conducting the review and making his decision in this contested case.

(Parenthetical omitted.)

Based upon Col. Grey's letter, his testimony, and the above findings, it is apparent that Col. Grey "review[ed] the case as if for the first time and ma[de] his decision from the evidence presented." It is not apparent that he considered the factors as directed by the Supreme Court, as we discuss in more detail below. We acknowledge that it is possible for an opinion to be "explained to" someone, but we

cannot discern from Col. Grey's letter and testimony he "understood the full import of all of its holdings," since he did not address the factors as directed by the Supreme Court.

The ALJ interpreted the Supreme Court's opinion as requiring consideration of as few as one of the listed factors, based upon the word "or" in one sentence. Those factors, sometimes referred to as the "*Wetherington* factors," as articulated by the Supreme Court are "the severity of the violation, the subject matter involved, the resulting harm, the trooper's work history, *or* discipline imposed in other cases involving similar violations." *Id.* at 592, 780 S.E.2d at 548 (emphasis added).

> 26. It is important to note that the Supreme Court uses the word "or." The usual and customary use of "or" indicates an alternative and oftentimes, as here, alternatives in a listing. If there is a choice between two items, then "or" would mean an alternative choice for either item. While the Supreme Court notes that it is appropriate and necessary to consider those factors, the use of "or" negates any mandatory findings or conclusions based on all of those factors.

> 27. Assuming *arguendo* that there is a requirement to give consideration to all of those factors, Col. Grey did, in fact, consider each of the Wetherington factors in reaching his decision to terminate Petitioner.

This interpretation of the "*Wetherington* factors" is not supported the text of *Wetherington I* or by later cases applying it. Although the factors as quoted in ALJ Overby's order are accurate, they are taken out of the context of the sentence in the case. Reading the Supreme Court's instruction in context, the "or" in this sentence

must be read as "and" when applied to the factors which should be considered. The

Supreme Court stated:

> *Notwithstanding the potentially expansive scope of this policy, Colonel Glover confirmed that he could not impose a punishment other than dismissal for any violation, apparently regardless of factors such as the severity of the violation, the subject matter involved, the resulting harm, the trooper's work history, or discipline imposed in other cases involving similar violations. We emphasize that consideration of these factors is an appropriate and necessary component of a decision to impose discipline upon a career State employee for unacceptable personal conduct.*

*Id.* (emphases added). The Supreme Court explained that Col. Glover could not

"impose a punishment other than dismissal for any violation" without regard for

these factors. *Id.* The Court then directed that "*consideration of these factors is an*

*appropriate and necessary component of a decision* to impose discipline upon a career

State employee for unacceptable personal conduct." *Id.* (emphasis added). Other

cases from this Court have interpreted *Wetherinton I* as requiring consideration of

any factors for which evidence is presented. *See Brewington*, 254 N.C. App. at 25,

802 S.E.2d at 131 ("Although the primary holding in *Wetherington* was that public

agency decision-makers must use discretion in determining what disciplinary action

to impose in situations involving alleged unacceptable personal conduct, the Court

did identify factors that are 'appropriate and necessary component[s]' of that

discretionary exercise." (alterations in original)); *accord Blackburn v. N.C. Dep't of*

*Pub. Safety*, 246 N.C. App. 196, 784 S.E.2d 509 (2016). Thus, Respondent was

directed to consider all of these factors, at least to the extent there was any evidence to support them. Respondent could not rely on one factor while ignoring the others.

ALJ Overby determined that "Col. Grey did, in fact, consider each of the Wetherington factors in reaching his decision to terminate Petitioner." But upon examination of his letter, we can find consideration of only two factors. We will address each factor as directed by the Supreme Court. Since we are to review "just cause" for dismissal de novo, we will review the factors based upon the "adjudicated fact" and the "remand facts."[10]

A.     The Severity of the Violation

Although Col. Grey's letter uses more words than Col. Glover's did to describe Petitioner's untruthfulness regarding losing his hat, the basic facts have not changed and were established in 2009, as quoted above. But Petitioner's untruthful statement regarding losing his hat was not a severe violation of the truthfulness policy. It did not occur in court and it did not affect any investigation, prosecution, or the function of the Highway Patrol. It was about a matter—exactly how Petitioner lost his hat— all parties concede was not very important.

Col. Grey considered the very insignificance of the subject matter an indication of the severity of the violation, indicating Petitioner could not be trusted in any

---

[10] By relying on the existing findings, we are essentially viewing the facts in the light most favorable to Respondent. Petitioner has challenged some of the findings on appeal, but we need not consider those challenges based upon our holding.

context. His letter to Petitioner stated, "Based upon the facts and circumstances of this case, as described above, I have no confidence that you can be trusted to be truthful to your supervisors or even to testify truthfully in court or at administrative hearings." ALJ Overby agreed that "Petitioner's lie was neither insignificant nor immaterial. Because the Petitioner chose to continue to lie about an insignificant event, his credibility is called into question all the more." This reading of the truthfulness policy sounds exactly like Col. Glover's "per se" rule—rejected by the Supreme Court—that any untruthful statement, even if the subject matter does not involve an investigation or official business, and no matter how insignificant the subject, requires dismissal, and no discipline short of dismissal will suffice. In fact, based on ALJ Overby's logic, the more "insignificant" the subject matter of the lie, the more Petitioner's credibility is called into question. Thus, a lie about a significant matter, such as untruthful testimony about a criminal investigation in court, would be a severe violation requiring dismissal because untruthfulness in that context obviously undermines the very mission of the Highway Patrol, while a lie about an *insignificant matter* must also result in dismissal because a trooper who would lie about something so insignificant cannot be trusted in any context, according to Col. Grey. This interpretation of the truthfulness policy is functionally indistinguishable from the "per se" dismissal rule applied by Col. Glover in *Wetherington I* and rejected by the Supreme Court.

Respondent made a similar argument seeking to embellish the severity of Petitioner's untruthfulness in *Wetherington I*, and this Court noted:

> Respondent contends in its brief that Petitioner "made up an elaborate lie full of fabricated details" regarding the "specific direction of the wind, the specific color of the truck and the noise he heard when the truck ran over his hat." However, neither the ALJ nor the SPC made findings indicating that the wind, truck's color, or "crunch noise" were untruthful. Rather, the lie or "untruth" lay only in the hat's location when Petitioner misplaced it. The ALJ found that Petitioner "didn't know if it was on the trunk lid of the truck, the boat, or behind the light bar, and blew off." *The findings do not support Respondent's characterization of Petitioner's statements as an "elaborate lie full of fabricated details[.]"*

*Wetherington I*, 231 N.C. App. at 511, 752 S.E.2d at 516 (alteration in original) (emphasis added).

On remand, there are no new facts and no new evidence which would allow us to come to any new conclusion regarding the severity of Petitioner's lie than this Court did in *Wetherington I*. Col. Grey relied only on the existing record. This Court has previously determined "the lie or 'untruth' lay only in the hat's location when Petitioner misplaced it," *id.*, and the Supreme Court did not modify this portion of this Court's opinion but instead affirmed it. *See Wetherington I*, 368 N.C. at 593, 780 S.E.2d at 509.

B.     The Subject Matter Involved

Col. Grey's letter notes the subject matter involved, the loss of the hat, but gives no consideration to this particular factor other than the fact that Petitioner lied about the location of the hat. He characterizes the subject matter of the untruthfulness appropriately as "over a trivial matter." Again, this particular violation of the truthfulness policy had no potential effect on any investigation or prosecution. Nor would the subject matter—or even Petitioner's untruthfulness about it—bring the Highway Patrol into disrepute, as some violations may. For example, in *Poarch v. North Carolina Department of Crime Control & Public Safety*, this Court affirmed a trooper's termination for just cause based on unacceptable personal conduct where the trooper was engaged in an extra-marital affair and "admitted to specific instances of sexual relations with Ms. Kirby, including sex in a Patrol car, sex behind a Patrol car, and sex in a Patrol office." 223 N.C. App. 125, 131, 741 S.E.2d 315, 319 (2012). This Court noted the trooper's misconduct, even committed when he was off duty, may harm the Patrol's reputation:

> After reviewing the record, we find the distinction between on duty and off duty based on the Patrol's radio codes to be of little significance in this case where petitioner was in uniform and the use of patrol facilities is so intertwined with the acts of misconduct. Furthermore, we find respondent's argument persuasive that if any member of the public would have witnessed petitioner's misconduct, where petitioner was in uniform and using patrol facilities, they would assume that petitioner was on duty to the detriment of the Patrol's reputation.

*Id.*

ALJ Overby appropriately noted the importance of truthfulness by law enforcement officers:

> 36. The world in which we live has become more tolerant and accepting of untruthfulness and outright lies. While it may be acceptable in some comers, it is not acceptable for everyone. With some occupations, there is a higher expectation for honesty and integrity, e.g., the judiciary and law enforcement officers. Those with power and authority have a greater responsibility.
>
> 37. The citizens of North Carolina and the public at large, including anyone visiting our state, deserve and expect honesty from the State Highway Patrol and law enforcement officers in general. It does not require any imagination at all to understand how devastating it would be if the Patrol tolerated and fostered a reputation for lack of honesty among its personnel. Yet it remains of paramount consideration that each case rises and falls on the particular facts and circumstances of this particular case. Not every case of untruthfulness merits termination.

We agree, and our Supreme Court was also well aware in *Wetherington I* that Petitioner had lied and of the importance of truthfulness by law enforcement officers. It was established in *Wetherington I* that (1) "the employee engaged in the conduct the employer alleges," and (2) "the employee's conduct falls within one of the categories of unacceptable personal conduct provided by the Administrative Code." *Warren,* 221 N.C. App. at 383, 726 S.E.2d at 925. Tonly issue left on remand in this case was whether Petitioner's lie, which is unacceptable personal conduct, "amounted to just cause for the disciplinary action taken. Just cause must be determined based

'upon an examination of the facts and circumstances of each individual case.'" *Id.* (quoting *Carroll*, 358 N.C. at 669, 599 S.E.2d at 900).

The facts as to the unacceptable personal conduct—the lie about the hat—are the same now as in *Wetherington I.* The Supreme Court could have rejected prior cases requiring consideration of various factors and a balancing of equities and adopted the "per se" rule for truthfulness for Troopers with the Highway Patrol as applied by Col. Glover, but it did not. Neither this Court nor the Supreme Court endorses untruthfulness of any sort by a law enforcement officer, but that is not the question presented here. The Supreme Court did not suggest that the Highway Patrol should "tolerate[] and foster[] a reputation for lack of honesty among its personnel" but only that some instances of untruthfulness may call for some discipline short of dismissal. The question is whether this lie, in this context, justifies dismissal, *without consideration of any lesser discipline,* upon consideration of all of the applicable factors. Neither Col. Glover nor Col. Grey actually conducted this full analysis. Col. Grey applied essentially the same "per se" rule as to truthfulness as did Col. Glover; he just used different words to describe it.

C.     The Resulting Harm

The third factor is "the resulting harm" from the violation. Col. Grey spends most of his letter discussing the *potential* harm to the agency from any untruthfulness by an officer, including a discussion of the requirements of *Brady v. Maryland*, 373

U.S. 83, 10 L.Ed.2d 215 (1963), and *Giglio v. United States,* 405 U.S. 150, 31 L. Ed. 2d 104 (1972). We agree, as noted above, that law enforcement officers must uphold the highest standards of truthfulness, particularly in the course of their official duties, and we appreciate the legal requirements for law enforcement agencies to disclose exculpatory evidence to defendants. Yet our Supreme Court was also well-aware of the requirements of *Brady* and *Giglio* when it decided *Wetherington I.* In support of its position, which the Supreme Court accurately characterized as a "per se" rule of dismissal for any violation of the truthfulness policy, Respondent made the same argument to the Supreme Court in *Wetherington I*.[11] But even considering the requirements of *Brady* and *Giglio*, our Supreme Court still rejected a "per se" rule of termination for untruthfulness. Although Col. Grey states he was not applying a per se rule, it is difficult to discern what sort of untruthfulness, in any context, by a trooper would not lead to termination, without even any consideration of lesser discipline. Respondent's counsel at oral argument agreed that a statement of this

---

[11] Respondent argued in its brief to this Court in *Wetherington I*, "From this point forward, in every criminal case in which Petitioner is associated, the judicial finding of untruthfulness here and the facts supporting that conclusion must be disclosed to the defendant. The United States Supreme Court in *Brady v. Maryland*, held that the prosecution must turn over all evidence which may favor the defendant." Before the Supreme Court, Respondent argued, "The Court of Appeals next dismissed concerns that in the future every district attorney would have to produce the record of Wetherington's falsehoods in response to any defendants' demands for exculpatory evidence in accordance with their rights under *Brady v. Maryland*. The Court of Appeals did not find that the Patrol's concerns were not legitimate. In fact, there are reported cases in which courts have order[ed] the prosecution to produce officer personnel files in response to *Brady*. However, the Court of Appeals found that Petitioner's history of untruthfulness would not bar him from testifying in court and SPC had not presented any argument that it was likely that defense counsel would use the information to impeach Wetherington or that the impeachment would cause a jury to disregard his testimony." (Citations omitted.)

sort regarding a missing hat does not compare to perjury while testifying in court or dishonesty in the investigation of a crime—the actual issues addressed by *Brady* and *Giglio*. It is easy to understand the resulting harm to the agency from a trooper's intentional lie about substantive facts in sworn testimony or in the course of his official duties. But Respondent has never been able to articulate how this particular lie was so harmful. Respondent failed to develop or present any additional facts on remand which could lead to a different determination.

D.     The Trooper's Work History

According to the letter, Col. Grey did give cursory consideration to Petitioner's work history. He stated:

> I have taken into consideration the fact that you had been employed by the Highway Patrol as a Cadet and as a State Trooper from June 2007 until the time of your dismissal on August 4, 2009 that you did not have any disciplinary actions prior to the time of your dismissal and that your overall performance rating and work history since being sworn as a Trooper in November 2007 was "Good."

The ALJ made these findings regarding Petitioner's work history:

> 53. According to that transcript, Wetherington was not previously disciplined by SHP. Wetherington was rated as one of the highest producers while in the field training program. His work and conduct history revealed exemplary service and conduct. In his 2008-2009 evaluation, Trooper Wetherington was rated as good or very good in every rating category. Judge Gray found that Wetherington's overall performance rating in 2008 was "3," which was average. Colonel Grey was aware of Wetherington's work history.

54. The *Employee Advisory Committee* report found that Wetherington was a very "devoted, dedicated" Trooper, and unanimously recommended reinstatement. Colonel Grey was aware of the Committee report.

55. The record of this contested case reflects that several laypersons and some of Wetherington's supervisors testified before Judge Gray in the first hearing at OAH. They testified to Wetherington's excellent work performance, character, and conduct. This Tribunal did not hear their testimony and therefore is unable to assess the credibility of their individual testimonies by taking into account the appropriate factors generally used for determining credibility. Their testimony is considered and given the appropriate weight.

(Parentheticals omitted.)

ALJ Overby goes into more detail than did Col. Grey, but nothing in Petitioner's work history would support termination. He had no prior disciplinary actions and a "good" performance rating and work history. This factor could only favor some disciplinary action short of termination. *See Whitehurst v. E. Carolina Univ.*, 257 N.C. App. 938, 947-48, 811 S.E.2d 626, 634 (2018) ("Whitehurst's discipline-free work history is also relevant to this just cause analysis. . . . . Whitehurst was subject to regular performance reviews by ECU and generally received above average ratings. Jimmy Cannon, an ECU police sergeant who worked with Whitehurst for roughly twelve years, testified that 'He's been an outstanding peer to work with especially when it comes to his knowledge of police procedures and police work in general. He's one of the best . . . that I've worked with[.]' Whitehurst

had worked for ECU for twelve years, with no disciplinary action. This factor also mitigates against a finding that just cause existed to dismiss Whitehurst from employment based on his conduct the night of 17 March 2016." (second and third alterations in original)).

E.      Discipline Imposed in Other Cases Involving Similar Violations

Col. Grey's letter did not mention any consideration of discipline imposed in other cases for similar violations. In his testimony, he stated he considered only violations occurring during his tenure as Commander, which began in March 2013. ALJ's Overby's order includes several findings regarding disparate treatment:

> 58. Disparate treatment is a factor which may be considered in assessing discipline.

> 59. The issue of disparate treatment was raised in the OAH hearing before Judge Gray in 2009. Judge Gray made specific Findings of Fact concerning disparate treatment.

> 60. In 2009, Judge Gray, in Finding No. 43, found that substantial evidence existed that "since at least 2002 all members of the Patrol with substantiated violations of truthfulness have been dismissed."

> 61. Judge Gray concluded then that it was not incumbent on the Highway Patrol to look back through history to find a lowest common denominator for assessing punishment from the historical point forward. There is no evidence of cases of disparate treatment more recent in time before this Tribunal for determining the most recent punishment by the Patrol for violation of the truthfulness policy; however, this Tribunal is not going to reach back into history in order to compare Petitioner's case with

similar cases from several years ago, without any recent cases for comparison, and especially cases decided by Col. Grey.

62. This current case was decided by Col. Grey in 2016. It is not fair or reasonable to hold the Highway Patrol to a standard set by disposition of its worse cases from many years before. Col. Grey decided the case based upon his thorough review of the totality of facts and circumstances of this case, including how he had disposed of cases during his tenure as Colonel. Col. Grey acknowledged that he reviewed only cases decided during his tenure.

(Parenthetical omitted.)

We first note that the finding as to discipline since 2002 is not relevant to Col. Grey's decision, as he testified, and the ALJ found, he did not consider any disciplinary actions prior to his tenure which began in 2013. In addition, the findings from the 2009 hearing seem to reflect a per se rule of dismissal for any untruthfulness. ALJ Gray found that "since at least 2002 *all members* of the Patrol with substantiated violations of truthfulness have been dismissed." This finding is consistent with application of the "per se" dismissal rule Col. Glover applied, and our Supreme Court *rejected* in *Wetherington I.* On remand, Col. Grey did not consider this history but acknowledged that he reviewed only cases decided during his tenure, which began in 2013, four years after Petitioner's termination. He did not describe the "untruthfulness" in any of those instances or the discipline imposed. Our record reveals no instances of disciplinary actions for untruthfulness which arose *during*

Col. Grey's tenure before his decision regarding Petitioner in 2016. Col. Grey did not identify any other violations during his tenure he may have compared to Petitioner's situation, and certainly did not identify any *similar* violations of the truthfulness policy.

Based upon the same evidence and facts, this Court analyzed this issue in *Wetherington I*. Regarding discipline imposed in other cases, the unanimous panel of this Court held:

> As the superior court observed in its order, the dissenting member of the SPC concluded that "the dismissal of Petitioner did not fit the violation and was not necessary to uphold the integrity of the truthfulness policy. In short, the punishment did not fit the offense." In view of the commensurate discipline approach described in *Warren* and applied in *Carroll*, we agree. Petitioner's conduct in this case did not rise to the level described in *Kea* and *Davis*. Rather, Petitioner's conduct and the existence of extenuating circumstances surrounding the conduct make this case comparable to Carroll, in which our Supreme Court concluded that the Commission lacked just cause to discipline the petitioner.

*Wetherington I*, 231 N.C. App. at 513, 752 S.E.2d at 517 (citation omitted).

This Court recently affirmed reversal of the Highway Patrol's dismissal of a trooper for unacceptable personal conduct. *Warren v. N.C. Dep't of Crime Control*, ___ N.C. App. ___, 833 S.E.2d 633 (2019). The trooper drove "his Patrol-issued vehicle" to a party at a private residence after consuming alcohol and with an open

bottle of vodka in the trunk of his vehicle.  *Id.* at \_\_\_, 833 S.E.2d at 635.  This Court

noted this dismissal was based upon disparate treatment.

> Respondent contends that petitioner's conduct was especially egregious so as to warrant termination. However, our review of the disciplinary actions respondent has taken for unbecoming conduct typically resulted in either: a temporary suspension without pay, a reduction in pay, or a demotion of title.  In fact, where the conduct was equally or more egregious than that of petitioner (i.e., threats to kill another person, sexual harassment, assault), the employee was generally subjected to disciplinary measures other than termination.
>
> While petitioner certainly engaged in unacceptable personal conduct, termination is inconsistent with respondent's treatment of similar conduct and, other factors mitigate just cause for the punishment.  Petitioner had an excellent work history and tenure of service, and there was no evidence that petitioner's actions resulted in harm.  Thus, taking into consideration all of the factors and circumstances in this case as suggested by *Wetherington*, we conclude the superior court properly determined there is no just cause for petitioner's termination based on his conduct.

*Id. at \_\_\_*, 833 S.E.2d at 638.

Again, Respondent had the opportunity on remand to address disciplinary

actions of other employees who violated the truthfulness policy, since Col. Glover did

not consider this factor in applying the "per se" rule in Petitioner's initial termination.

Col. Grey had the opportunity to note factors in other disciplinary cases which

support dismissal for Petitioner's violation, but he did not.  *Wetherington I*, 368 N.C.

at 592, 780 S.E.2d at 548.  We agree that Col. Grey need not "look back through

history to find a lowest common denominator for assessing punishment" but he must consider if there is some relevant denominator in the Highway Patrol's prior history for comparison. Although there is no particular time period set for this factor, we find no legal basis for relying only upon disciplinary actions during a particular commander's tenure. If this were the rule, during the first week, or month, or any time period of a new colonel's tenure until a disciplinary action based upon a particular violation has occurred, there would be no history at all, and the disparate treatment factor would have no meaning. For a new commander, disparate treatment would by definition be impossible, if he can ignore all relevant prior history for the agency in imposing discipline.

Thus, Col. Grey failed to consider most of the factors our Supreme Court directed were "necessary" in this case. The only factor he clearly addressed was Petitioner's work history, which would favor discipline short of dismissal. The Supreme Court stated: "We emphasize that consideration of these factors is an appropriate *and necessary component of a decision to impose discipline* upon a career State employee for unacceptable personal conduct. *Wetherington I*, 368 N.C. at 592, 780 S.E.2d at 548 (emphasis added). Instead, he considered only his personal assessment of the importance of Petitioner's untruthful statements, and although his letter was longer, his consideration was substantively no different from Col Glover's. As this Court noted in *Wetherington I*: "The findings do not support Respondent's

characterization of Petitioner's statements as an 'elaborate lie full of fabricated details[.]'" *Wetherington I*, 231 N.C. App. at 511, 752 S.E.2d at 516 (alteration in original).

## V.     Disposition

Our Courts rarely grant parties in cases two bites at the apple, but Respondent here has already had the opportunity for two bites. There is no basis for further remand other than for the appropriate remedy. Upon our *de novo* review of the existence of just cause, we reverse ALJ Overby's conclusion that "Respondent met its burden of proof and established by substantial evidence that it had just cause to dismiss Petitioner from employment with the State Highway Patrol for unacceptable personal conduct." However, Respondent has established that some disciplinary action short of dismissal should be imposed. We also reverse the ALJ's conclusion that "Respondent has not exceeded its authority or jurisdiction; acted erroneously; failed to use proper procedure; acted arbitrarily or capriciously; and has not failed to act as required by law or rule." We hold that Respondent failed to use proper procedure on remand and failed to act as required by law or rule in that it should have considered the factors as directed by the Supreme Court. We therefore remand for the ALJ to enter an order granting Petitioner relief under North Carolina General Statute § 126-34.02. Specifically, the ALJ shall order an appropriate level of discipline, in accord with the law regarding disparate treatment, followed by

reinstatement and "other suitable action to correct the abuse which may include the requirement of payment for any loss of salary which has resulted from the improper action of the appointing authority." N.C. Gen. Stat. § 126-34.02(a) (2017).

> Under subsection (a)(3) of the statute, the ALJ has express statutory authority to "[d]irect other suitable action" upon a finding that just cause does not exist for the particular action taken by the agency. Under the ALJ's de novo review, the authority to "[d]irect other suitable action" includes the authority to impose a less severe sanction as "relief."
>
> Because the ALJ hears the evidence, determines the weight and credibility of the evidence, makes findings of fact, and "balanc[es] the equities," the ALJ has the authority under *de novo* review to impose an alternative discipline. Upon the ALJ's determination that the agency met the first two prongs of the *Warren* standard, but just cause does not exist for the particular disciplinary alternative imposed by the agency, the ALJ may impose an alternative sanction within the range of allowed dispositions.

*Harris*, 252 N.C. App. at 109, 798 S.E.2d at 138 (alterations in original) (citation omitted).

## VI.  Conclusion

Upon *de novo* review of the existence of just cause, the ALJ's order affirming Petitioner's dismissal is reversed and we remand to the ALJ for further proceedings consistent with our directive above.

Reversed and Remanded.

Judges BRYANT and DIETZ concur.